**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| Adrian B. Arroyo, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No.: |
| | ) | |
| v. | ) | |
| | ) | |
| Equifax Information Services, LLC, | ) | **COMPLAINT** |
| | ) | **WITH JURY TRIAL DEMAND** |
| Defendant. | ) | |
| | ) | |

**PRELIMINARY STATEMENT**

1.      The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. Congress enacted the Fair Credit Reporting Act, 15 U.S. Code § 1681, *et seq*. (the "FCRA") to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

2.      Under the FCRA, consumer reporting agencies are charged with two primary duties: the duty to follow reasonable procedures to assure maximum

1

possible accuracy of information when preparing consumer reports; and the duty to reasonably reinvestigate consumers' disputes of inaccurate information, and then appropriately correct or modify the disputed information. A consumer reporting agency's duty to reasonably reinvestigate consumers' disputes of inaccurate information explicitly includes the duty to notify the furnisher of the disputed information. This is because the furnisher of the disputed information stands in a better position to make a thorough investigation of the disputed information than the credit reporting agency.

3.      Defendant compiles, maintains, and reports information concerning Plaintiff's credit-worthiness, credit-standing, credit capacity, character, and general reputation. That information is then made available for use by third-parties in credit transactions involving Plaintiff, for employment purposes, the underwriting of insurance for Plaintiff, and even in connection with a determination of Plaintiff's eligibility for a license or other governmental benefit. Accordingly, and pursuant to various provisions of the FCRA, Plaintiff has a legally protected interest in Defendant fulfilling its respective duties under the FCRA, so that the information reported and maintained by Defendant is done so in a manner which is fair and

equitable to Plaintiff, with regards to the confidentiality, accuracy, and relevancy of that information.

4.    This action for damages is based on Defendant's false reporting on Plaintiff's credit files and/or consumer reports, failures to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff, and failures to conduct reasonable investigations and reinvestigations with respect to disputes of such information.

## **PARTIES**

5.    Plaintiff, Adrian B. Arroyo, is a natural person who resides in Floyd County, Georgia.

6.    Plaintiff is an individual and is, therefore, a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

7.    Defendant, Equifax Information Services, LLC ("Equifax"), is a limited liability company formed under the laws of the State of Georgia and registered to do business in the State of Georgia. Equifax may be served with process via its registered agent, Corporation Service Company, at 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

8.   Equifax regularly assembles and/or evaluates consumer credit information for the purpose of furnishing consumer reports to third parties and uses interstate commerce to prepare and/or furnish the reports. Accordingly, Equifax is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

## JURISDICTION AND VENUE

9.   This Court has federal question jurisdiction over Plaintiff's Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*., claims pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

10.   This Court has personal jurisdiction over Defendant pursuant to O.C.G.A. § 9-10-91(1) because, *inter alia*, Defendant frequently and routinely conducts business in the State of Georgia, including the conduct complained of herein.

11.   Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claims occurred in this district.

12.   Pursuant to LR 3.1B(3), venue is proper in the Atlanta Division because Defendant maintain an agent for service of process within the Atlanta Division.

## ALLEGATIONS OF FACT

13.     On or about January of 2024, Plaintiff obtained a residential home loan from Milend, Inc. (the "Mortgage").

14.     Freedom Mortgage Corporation ("Freedom") ultimately became the servicer of the Mortgage.

15.     Plaintiff has continued to make Mortgage payments to Freedom and Freedom has continued to service Plaintiff's Mortgage and accept Mortgage payments.

16.     15 U.S.C. § 1681e(b) requires consumer reporting agencies to follow reasonable procedures to assure maximum possible accuracy of information concerning the individual about whom a report relates. Similarly, 15 U.S.C. § 1681i(a)(1) requires consumer reporting agencies to conduct reasonable reinvestigations of a consumer's dispute of the completeness or accuracy of any item of information contained in the consumer's file.

17.     As an integral aspect of its duties under the FCRA, Equifax is required to have in place adequate and reasonable policies and procedures to assure the maximum possible accuracy of information concerning individuals about whom

Equifax produces reports; the requirement to maintain reasonable procedures extends to Equifax's handling and reinvestigation of disputed information.

*The National CRAs and the Furnishers of Consumer Information Communicate Metro 2 Compliant Notices of Consumer Disputes and Responses, Respectively, Through the e-Oscar Reporting Platform*

18.    The FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to the CRA may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file. 15 U.S.C. § 1681i(a)(5)(D).

19.    To comply with the automated dispute reinvestigation requirements of the FCRA, Trans Union, Equifax, and Experian (the three major "National CRAs"), along with Innovis Data Solutions, Inc., developed and implemented a browser-based software system that allows the CRAs to electronically notify furnishers quickly and easily of disputed credit reporting information, and for furnishers to quickly and easily respond to such disputes following the furnisher's investigation of the disputed information.

20.    The system is commonly referred to as e-OSCAR (Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant. See *http://www.e-oscar.org/* (last accessed December 12, 2025).

6

21.    The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Data Form ("AUD") processing, as well as other consumer-dispute-related processes. *Id*.

22.    The National CRAs, provide notice of a consumer's dispute to data furnishers in the ACDV format, and forward the ACDV to the furnisher through e-OSCAR.

23.    If a furnisher's investigation of a consumer's dispute determines that the information in dispute is incomplete or inaccurate, the FCRA requires the furnisher to correct the information not only with the CRA that sent the ACDV, but with all other CRAs to whom the furnisher reported that information. 15 U.S.C. § 1681s-2(b)(1)(D).

24.    The e-OSCAR system facilitates the furnisher's compliance with 15 U.S.C. § 1681s-2(b)(1)(D) by sending a "Carbon Copy" of an ACDV response "to each CRA with whom the [furnisher] has a reporting relationship" in addition to the response to the initiating CRA. See *https://www.e-oscar.org/implementation/about-us* (last accessed December 12, 2025).

25.    Additionally, a furnisher can manually correct a tradeline with a CRA other than the one that initiated a dispute by sending an AUD within e-OSCAR.

26.    The failure on the part of a CRA and/or a furnisher to adhere to the accepted Metro 2 standards can itself support a finding of willful violation as described by 15 U.S.C. § 1681n when that failure results in a report that is false, incomplete, and misleading.

27.    Further, the failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n(a). *See*, *Gillespie v. Equifax Info. Servs., LLC*, No. 05C138, 2008 WL 4316950, at *8 (N.D. Ill. Sept. 15, 2008).

### *The Metro 2 Guidelines Mandate Regular Monthly Reporting of All Accounts*

28.    As part of that industry standard, the Metro 2 Format Task Force has declared, "All accounts must be reported *on a monthly basis*." [Emphasis added] CRRG at 2-2.

29.    Because consumer credit information changes monthly, failure to update that information on a monthly basis, yet still publishing reports containing the previously reported information without updates, means that the information being reported is almost certainly incomplete, inaccurate, and misleading.

### **Plaintiff's Equifax Consumer Report**

30.    On or about October of 2025, Plaintiff obtained a copy of his consumer report as published by Equifax.

31.    That report contained erroneous information as provided by Freedom and as published and reported by Equifax.

32.    The relevant portion of the Freedom tradeline showed the Mortgage as being closed and having a balance of $0 a monthly payment of $0.

33.    The Equifax report contained a factual inaccuracy by stating the balance of the mortgage was $0.

34.    The Equifax report contained a factual inaccuracy by reporting a monthly payment of $0.

35.    The Equifax report contained a factual inaccuracy by reporting the account as closed.

36.    In a letter dated October of 2025, Plaintiff disputed the inaccurate and misleading information directly to Equifax and advised Equifax that his mortgage was not closed and did not have a balance of $0 nor a monthly payment of $0.

37.    The dispute letter provided Defendant with sufficient information to identify and correct the inaccurate facts which they were reporting.

38.    Plaintiff's dispute asked Equifax to correct factual inaccuracies about the Mortgage on his credit report.

39.    Plaintiff did not ask Equifax to make any type of legal determination about his Mortgage.

40.    The fact that Plaintiff's mortgage did not have a balance of $0 was objectively and readily verifiable information.

41.    The fact that Plaintiff's mortgage did not have a monthly payment of $0 was objectively and readily verifiable information.

42.    The fact that Plaintiff's mortgage was not closed was objectively and readily verifiable information.

43.    Plaintiff did not receive a response from Equifax.

44.    Plaintiff resubmitted his dispute in December of 2025.

45.    Pursuant to 15 U.S.C. § 1681i, Equifax had a duty to notify Freedom of Plaintiff's dispute within five business days of receiving the dispute, to forward the supporting documents submitted with Plaintiff's dispute for Freedom's review, to conduct a reasonable reinvestigation of the disputed information, and to correct the tradeline or delete it from Plaintiff's consumer file.

46.     Upon information and belief, Equifax timely notified Freedom of Plaintiff's dispute, via e-OSCAR or otherwise, and provided the supporting documents submitted with Plaintiff's dispute.

47.     Alternatively, Equifax failed to notify Freedom of Plaintiff's dispute, and/or failed to provide the supporting documents submitted with Plaintiff's dispute.

48.     Upon information and belief, Freedom received timely notice of Plaintiff's dispute from Equifax.

49.     Pursuant to 15 U.S.C. § 1681s-2(b), Freedom had a duty to conduct an investigation with respect to the disputed information, and to modify or delete that information appropriately.

50.     Upon information and belief, Equifax failed to notify Freedom of Plaintiff's dispute and to provide the supporting documents supplied by Plaintiff as required by 15 U.S.C. § 1681i despite its written assurance to Plaintiff to the contrary.

51.     Upon information and belief, Defendant did not perform any reinvestigation of Plaintiff's dispute, under either "standard" or "expedited" procedures, as described by § 1681i(a)(8), but instead simply repeated the inaccurate tradeline information.

11

52.     Plaintiff's dispute was neither frivolous nor irrelevant.

53.     Defendant did not inform Plaintiff that it had determined the dispute was frivolous or irrelevant.

54.     Plaintiff accessed his Equifax credit report again in February of 2026 and the Equifax credit report still contained the same factual errors which Plaintiff had disputed.

55.     Equifax reported the Mortgage as closed.

56.     Defendant's post-investigation reporting is false and misleading.

57.     Defendant's post-investigation reporting is in derogation of the Metro 2 reporting standards, and that departure and failure to adhere to the adopted guidelines renders the reporting both false and materially misleading, as users of consumer reports assume Defendant's compliance with Metro 2 standards in reporting consumer information.

58.     Plaintiff is informed and believes that the revised tradeline reflects any information provided by Freedom to Equifax in response to Plaintiff's dispute.

## INJURIES-IN-FACT

### Effect of Consumer Reports Which Contain
### Inaccurate or Misleading Information

59.     Under the FCRA, the term "consumer report" generally refers to:

any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for:

     i.     credit or insurance to be used primarily for personal, family, or household purposes;

     ii.    employment purposes; or

     iii.   any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a(d)(1).

60.    The information contained in a consumer report bears on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, and personal characteristics.

61.    The information contained in a consumer report can have a tremendous effect on the consumer; to name only a few, the report can impact the consumer's:

     a.    Eligibility for and terms for credit;

     b.    Potential for refinancing of existing credit;

     c.    Eligibility for leasing prospects;

     d.    Eligibility for utility services;

     e.    Eligibility for and the terms of insurance;

f.      Employment or potential employment;

g.      Accounts which are under collection or review;

h.      Eligibility for a license or other benefit granted by a governmental instrumentality, particularly where the instrumentality is required by law to consider an applicant's financial responsibility or status;

i.      Standing with potential investors or servicers; and

j.      Eligibility for individually-billed travel charge cards used by executive departments and agencies.

62.    The terms "consumer report", "credit report", and "consumer credit report" are used synonymously herein.

63.    Approximately two million consumer reports are issued by credit bureaus each day. See, Robert B. Avery, Paul S. Calem, and Glenn B. Canner, Federal Reserve Division of Research and Statistics, and Raphael W. Bostic, University of Southern California, *An Overview of Consumer Data and Credit Reporting* (February 2003), p. 48-49, available at https://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf, *archived at* https://perma.cc/DCY4-ZS6C (last accessed on December 12, 2025).

14

64.    In 2012, the Federal Trade Commission conducted a study regarding consumer credit reporting errors and determined that anywhere from 10 to 21 percent of consumers have confirmed errors on their consumer reports. Federal Trade Commission, *Report to Congress under Section 319 of the Fair and Accurate Credit Transactions Act of 2003* (December 2012), p. iv of Executive Summary, available at https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accurate-credit-transactions-act-2003-fifth-interim-federal-trade-commission/130211factareport.pdf, *archived at* https://perma.cc/R3P4-FGV9 (last accessed on December 12, 2025).

65.    The FTC study found that not only do these errors adversely affect consumers' credit scores, but the estimated proportion of reports and consumers who experience a positive credit score change resulting from the *correction* of these errors is higher than previous estimates from the credit reporting industry. *Id*.

### Credit Scoring

66.    The Fair Isaac Corporation credit risk scoring system, commonly referred to as "FICO", is the leading credit scoring system and utilizes data reported by credit reporting agencies. See, https://www.myfico.com/credit-education/credit-scores/ (last accessed on December 12, 2025).

67.     The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id*.

68.     The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, *Supervision and Examination Manual, Version 2* (October 2012), p. 53, available at http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf, *archived at* http://perma.cc/JF32-RFAA, (last accessed on December 12, 2025).

69.     FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and mix of accounts/types of credit accounts for 10% of a consumer's FICO score. See,

https://www.myfico.com/credit-education/whats-in-your-credit-score/, *archived at* https://perma.cc/E8Y3-F4AA (last accessed December 12, 2025).

70. Payment history is the most important aspect of a consumer's credit score because it shows how the consumer has managed his finances, including any late payments. Credit history is also very important, as it demonstrates how long the consumer has been managing his accounts, when his last payments were made, and any recent charges. See, https://www.transunion.com/credit-score, *archived at* https://perma.cc/NRZ4-W83U (last accessed December 12, 2025).

71. The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

72. Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

73. Incorrectly reporting the tradeline of Plaintiff's Mortgage—which is open, active, and has a balance that Plaintiff is making payments on—with incorrect,

17

outdated payment information and as having a $0 balance, adversely affects Plaintiff's FICO scores, as it excludes any recent positive payment history associated with the Mortgage, it alters the age/length of credit history, and it alters the mix of accounts/types.

74.     There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score. That is, a twenty-five-point change in a credit score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure.

75.     Consistent with FTC study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. See,        https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report/, *archived at* https://perma.cc/9TQN-S5WP (last accessed December 12, 2025).

### *Credit-Based Insurance Scoring*

76.    Other entities that regularly review consumer reports, and use the data contained therein, are insurance companies.

77.    Insurance companies use a scoring mechanism which is similar to, but distinct from, the "credit score" used by creditors.

78.    Credit-based insurance scores, like credit scores themselves, are numerical summaries of consumers' credit histories; credit-based insurance scores are typically calculated using a multitude of information, including, but not limited to, the length and age of credit history and the use of certain types of credit. Federal Trade Commission, *Credit-Based Insurance Scores: Impacts on Consumers of Automobile Insurance* (July 2007), p. 11, available at https://www.ftc.gov/sites/default/files/documents/reports/credit-based-insurance-scores-impacts-consumers-automobile-insurance-report-congress-federal-trade/p044804facta_report_credit-based_insurance_scores.pdf, *archived at* https://perma.cc/B2VQ-452N (last accessed December 12, 2025). As cited in *Ins. Inst. V. Commissioner*, 486 Mich. 370, 785 N.W.2d 67 (2010).

79.    Credit-based insurance scores evolved from traditional credit scores, and all major automobile insurance companies use credit-based insurance scores in

some capacity; insurers use these scores to assign consumers to risk pools and to determine the premiums that they pay. *Id*. at 22.

80.   A Wallethub study determined that a change in credit scores caused a consumer's automobile insurance rates to rise by an average of 67% nationwide, and an average of 84% in Georgia. *2018's States Where Credit Scores Affect Car Insurance the Most – Credit Score & Car Insurance Report*, available at https://wallethub.com/edu/car-insurance-by-credit-score-report/4343/, *archived at* https://perma.cc/CSL8-D47Y (last accessed December 12, 2025).

81.   Homeowner's insurance companies also use credit scores to decide whether to issue policies, and on what terms. A higher credit score is taken to mean that a consumer is less of a risk, which, in turn, means the consumer is more likely to be able to obtain insurance, and pay less for it.

See   https://www.consumer.ftc.gov/articles/0152-credit-scores,   *archived   at* https://perma.cc/EB3D-54UP (last accessed December 12, 2025).

82.   The National Association of Insurance Commissioners ("NAIC") is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five

U.S. territories. See, http://www.naic.org/index_about.htm (last accessed December 12, 2025).

83.    The NAIC advises consumers who find errors on their credit reports to contact the credit reporting company to have the errors corrected, as the errors can affect the consumer's credit-based insurance score. National Association of Insurance Commissioners, *Credit-Based Insurance Scores: How an Insurance Company Can Use Your Credit to Determine Your Premium*, available at http://www.naic.org/documents/consumer_alert_credit_based_insurance_scores.htm, *archived at* https://perma.cc/S4F2-9VTL (last accessed December 12, 2025).

84.    There are several different companies that create credit-based insurance score reports for insurers to use, including the Fair Isaac Corporation. In calculating credit-based insurance scores, FICO looks at five general areas it believes will best determine how an individual manage risks. *Id*.

85.    The following is a breakdown of what FICO considers in calculating credit-based insurance scores, and how much the information generally weighs in that calculation: payment history accounts for 40% of a consumer's of a consumer's FICO credit-based insurance score; debt/amounts owed accounts for 30% of a consumer's of a consumer's FICO credit-based insurance score; age/length of credit

history accounts for 15% of a consumer's FICO credit-based insurance score; new credit/recent inquiries accounts for 10% of a consumer's of a consumer's FICO credit-based insurance score; and, mix of accounts/types of credit accounts for 5% of a consumer's of a consumer's FICO credit-based insurance score. *Id*.

86. Defendant's actions and omissions have caused Plaintiff to lose time attempting to correct the false information on Plaintiff's consumer reports.

87. The time spent by a person attempting to correct a false credit report constitutes a concrete injury for purposes of an FCRA claim. *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 16-17107, 2019 U.S. App. LEXIS 33662, at *5 (11th Cir. Nov. 12, 2019), citing Pedro v. Equifax, Inc., 868 F.3d 1275, 1280 (11th Cir. 2017).

88. Defendant's actions and omissions have resulted in the illegitimate suppression of Plaintiff's FICO credit scores and other credit rating model scores.

89. The adverse effect on Plaintiff's credit scores places Plaintiff at the material risk of being denied credit or receiving less favorable credit terms than she otherwise would.

90. Further, the Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes

of standing under Article III. *Pedro v. Equifax, Inc*., 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *Santangelo v. Comcast Corp*., 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC*, No. 14-01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to a credit score is sufficient to constitute 'actual damages'"); *Green v. RentGrow, Inc*., No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are sufficient to allege a

23

concrete injury-in-fact for the purposes of standing under Article III."); and, *Coulbertson v. Experian Info. Sols., Inc*., No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

91.    Defendant's actions and omissions have resulted in the illegitimate suppression of Plaintiff's credit-based insurance scores.

92.    Plaintiff's correct payment history would be included in Plaintiff's Equifax credit report if Defendant had conducted appropriate investigations of Plaintiff's disputes.

## DAMAGES

### Actual Damages

93.    As a result of Defendant's actions and omissions, Plaintiff has suffered actual damages.

94.    These damages include out-of-pocket expenses incurred as a result of Defendant's wrongful representations regarding the Mortgage, and Defendant's failures to abide by their obligations under the FCRA.

95. Plaintiff has suffered a decrease in Plaintiff's credit scores as a result of Defendant's wrongful representations regarding the Mortgage, and Defendant's failures to abide by their obligations under the FCRA.

96. Plaintiff has also experienced physical symptoms of aggravation, frustration, and stress due to the fact that Defendant is failing to correct Plaintiff's credit report.

## Statutory and Punitive Damages

97. At the time Defendant reported the information at issue in this matter, Defendant had actual notice that the information it was reporting regarding Plaintiff and the Mortgage was false, deceptive, and misleading.

98. For example, Plaintiff included corroborating documents with his dispute, which was more than sufficient to establish that the disputed information was being reported inaccurately.

99. Finally, Plaintiff is informed and believes that Freedom has previously provided Equifax with information containing these same (or substantially similar) errors on a multitude of occasions, thus placing Equifax on notice of Freedom's unreliability, and deficiencies in Freedom's systems and procedures, which have

repeatedly caused these errors to propagate in data provided by Freedom and elude correction upon dispute by consumers.

100. Defendant had more than enough information to correct its false, deceptive, and misleading reporting.

101. Despite that, Defendant continued to report the false, deceptive, and misleading information regarding Plaintiff and the Mortgage.

102. Defendant failed to correct its false, deceptive, and misleading reporting, and in fact continued to report false, deceptive, and misleading information regarding Plaintiff, as described herein.

103. Accordingly, Defendant's conduct was willful.

104. As a result of Defendant's willful actions and omissions, Plaintiff is eligible to recover actual damages or statutory damages of up to $1,000, potential punitive damages, costs of this action, and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and/or 1681o.

## CAUSE OF ACTION

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. §§ 1681e(b) and 1681i
### Equifax Information Services, LLC

26

105.   Plaintiff incorporates by reference the preceding paragraphs as though fully stated herein.

106.   Pursuant to 15 U.S.C. § 1681e(b), Equifax is responsible for following reasonable procedures to assure maximum possible accuracy of information whenever it prepares consumer reports about Plaintiff.

107.   Pursuant to 15 U.S.C. § 1681i(a)(1)(A), Equifax had an affirmative duty to independently investigate the dispute submitted by Plaintiff.

108.   Pursuant to 15 U.S.C. § 1681i(a)(2), Equifax was required to communicate the specifics of Plaintiff's disputes to Freedom, including the forwarding of any documents provided by Plaintiff in support of that dispute.

109.   A consumer reporting agency's reasonable reinvestigation must be a good faith effort to ascertain the truth; a reasonable reinvestigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

110.   A reasonable reinvestigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

111.   The reasonableness of a reinvestigation under the FCRA is generally a question of fact for the jury.

112. In order to conduct a reasonable reinvestigation, and pursuant to 15 U.S.C. § 1681i(a)(4), Equifax was required to review and consider all relevant information submitted by Plaintiff.

113. Plaintiff's dispute was clear and unambiguous as to the inaccuracies of Equifax's reporting of the Mortgage.

114. Plaintiff provided all the relevant information necessary for Equifax to conduct a reasonable reinvestigation, and correct the inaccuracies in its reporting.

115. Equifax breached its duties as described herein.

116. If Equifax had conducted a reasonable reinvestigation of Plaintiff's disputes, Equifax would have reviewed and considered all of the information Plaintiff submitted in his disputes, and would have easily detected that what was being reported regarding the Mortgage was factually incorrect, inaccurate, and misleading.

117. If Equifax had conducted a reasonable reinvestigation of Plaintiff's disputes, the Freedom tradeline on Plaintiff's Equifax consumer report would have been appropriately corrected.

118. Due to Equifax's failures to follow reasonable procedures to assure maximum possible accuracy of information, and failures to conduct a reasonable

28

reinvestigation of Plaintiff's disputes, the false and misleading information in Plaintiff's credit file and on Plaintiff's Equifax report was not appropriately modified.

119. Equifax had all the information necessary to correct its reporting. Despite that, Equifax failed to correct the false, disputed information, in the face of clear evidence that its reporting was false and misleading. That failure indicates that Equifax's reinvestigation procedures were not reasonable.

120. The fact that Equifax had all the information necessary to correct its reporting, yet failed to do so in an appropriate manner, further indicates that Equifax recklessly disregarded Plaintiff's disputes and the requirements of the FCRA, amounting to a willful violation of the statute.

121. Upon information and belief, Equifax has prepared consumer reports containing the incomplete and inaccurate information at issue, and has published the incomplete and inaccurate information to third parties.

122. Equifax willfully, or in the alternative negligently, violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of information concerning Plaintiff in consumer reports, in

reckless disregard of the statutory requirements, Plaintiff's disputes, and the publicly recorded Bankruptcy Case filings.

123. Equifax willfully, or in the alternative negligently, violated 15 U.S.C. § 1681i in multiple ways, including without limitation, by failing to properly notify Freedom of Plaintiff's disputes, by failing to provide Freedom with all the supporting information/documents included with Plaintiff's disputes, by failing to conduct a reasonable reinvestigation of Plaintiff's disputes, and by failing thereafter to appropriately modify information in Plaintiff's file and on his consumer reports in reckless disregard of the statutory requirements.

124. As a result of Equifax's violations of 15 U.S.C. §§ 1681e(b) and 1681i, Plaintiff has suffered actual damages as described herein. Plaintiff is, therefore, entitled to recover actual damages from Equifax pursuant to 15 U.S.C. §§ 1681n and 1681o.

125. Equifax's actions and omissions were willful, rendering Equifax liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

126. Plaintiff is entitled to recover costs and attorneys' fees from Equifax pursuant to 15 U.S.C. §§ 1681n and 1681o.

## TRIAL BY JURY

127.   Plaintiff is entitled to and hereby requests a trial by jury.

**WHEREFORE**, Plaintiff prays that judgment be entered in her favor and against Defendant for:

a)   Plaintiff's actual damages;

b)   Statutory damages of $1,000 per violation of the FCRA pursuant to 15 U.S.C. § 1681n;

c)   Punitive damages pursuant to 15 U.S.C. § 1681n;

d)   Reasonable attorney's fees and costs pursuant to 15 U.S.C. §§ 1681n and/or 1681o; and

e)   Such other and further relief as may be just and proper.

Respectfully submitted this 17th day of March, 2026.

BERRY AND ASSOCIATES

*/s/ Matthew T. Berry*
Matthew T. Berry, GA Bar No.: 055663
Berry & Associates
2751 Buford Highway, Suite 600
Atlanta, GA 30324
Ph. (404) 235-3305
Fax (404) 235-3333
matt@mattberry.com

*/s/ Chris Armor*

31

Christopher N. Armor
Georgia Bar No. 614061
P.O. Box 509
Londonderry, Vermont 05148
Phone 651-208-6441
Fax 404-592-6102
chris.armor@armorlaw.com
*Attorneys for Plaintiff*